UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :

              - v. -              :

S.A.C. CAPITAL ADVISORS, L.P.,    :
S.A.C. CAPITAL ADVISORS LLC,
CR INTRINSIC INVESTORS, LLC, and  :
SIGMA CAPITAL MANAGEMENT, LLC,
                                  :
              Defendants.

- - - - - - - - - - - - - - - - - X

ORIGINAL

SEALED
INDICTMENT

**13 CRIM 541**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 2 3 2013

## COUNT ONE

(Wire Fraud)

The Grand Jury charges:

1.     As described below, this Indictment charges the
corporate entities responsible for the management of a major
hedge fund with criminal responsibility for insider trading
offenses committed by numerous employees and made possible by
institutional practices that encouraged the widespread
solicitation and use of illegal inside information.  Unlawful
conduct by individual employees and an institutional
indifference to that unlawful conduct resulted in insider
trading that was substantial, pervasive and on a scale without
known precedent in the hedge fund industry.

### The SAC Capital Entities

2.     At all times relevant to this Indictment, an
individual residing in Greenwich, Connecticut (the "SAC Owner")

JUDGE SWAIN

operated a group of affiliated hedge funds (collectively, the "SAC Hedge Fund" or "SAC"). The SAC Hedge Fund, founded by the SAC Owner in or around 1992, included, at its peak, over $15 billion of assets under management. The majority of the capital managed by the SAC Hedge Fund at all relevant times belonged to the SAC Owner himself, with the balance of capital provided by outside investors.

3.    The SAC Owner operated the SAC Hedge Fund through his ownership of several fund management companies, which served as investment advisors for the SAC Hedge Fund. These management companies generally charged outside investors in the SAC Hedge Fund annual fees of approximately three percent of assets under management and up to 50 percent of investment returns. The principal management companies were as follows: (i) CR INTRINSIC INVESTORS, LLC ("CR INTRINSIC"), a Delaware limited liability company; (ii) SIGMA CAPITAL MANAGEMENT, LLC ("SIGMA CAPITAL"), a Delaware limited liability company; (iii) S.A.C. CAPITAL ADVISORS, LLC ("SAC CAPITAL LLC"), a Delaware limited liability company that actively managed investments in the SAC Hedge Fund through approximately 2008; and (iv) S.A.C. CAPITAL ADVISORS, L.P.("SAC CAPITAL LP") a Delaware limited partnership that actively managed investments in the SAC Hedge Fund beginning in

2

approximately 2009 (collectively, the "SAC ENTITY DEFENDANTS").

## Overview of The Scheme

4.    At various times between in or about 1999 through
at least in or about 2010, employees and agents of SAC CAPITAL
LP, SAC CAPITAL LLC, CR INTRINSIC, and SIGMA CAPITAL, the
defendants, obtained material, non-public information ("Inside
Information") relating to publicly-traded companies and traded
on that Inside Information in order to (i) increase the return
on investment in the SAC Hedge Fund; and (ii) increase fees
received by the SAC ENTITY DEFENDANTS.

5.    The SAC ENTITY DEFENDANTS committed the insider
trading scheme through the acts of, among others, numerous
portfolio managers ("SAC PMs") and research analysts ("SAC RAs")
who engaged in a pattern of obtaining Inside Information from
dozens of publicly-traded companies across multiple industry
sectors.  Employees of the SAC ENTITY DEFENDANTS traded on
Inside Information themselves and, at times, recommended trades
to the SAC Owner based on Inside Information.

6.    The SAC ENTITY DEFENDANTS enabled and promoted
the Insider Trading scheme through several means detailed
herein.  First, the SAC ENTITY DEFENDANTS sought to hire SAC PMs
and SAC RAs with proven access to public company contacts likely

to possess Inside Information.  Second, the SAC ENTITY DEFENDANTS' employees were financially incentivized to recommend to the SAC Owner "high conviction" trading ideas in which the SAC PM had an "edge" over other investors, but repeatedly were not questioned when making trading recommendations that appeared to be based on Inside Information.  Third, on numerous occasions the SAC ENTITY DEFENDANTS failed to employ effective compliance procedures or practices to prevent SAC PMs and SAC RAs from engaging in insider trading.

   7. At bottom, the encouragement by the SAC ENTITY DEFENDANTS of SAC PMs and SAC RAs to pursue aggressively an information "edge" overwhelmed limited SAC compliance systems. Further, the relentless pursuit of an information "edge" fostered a business culture within SAC in which there was no meaningful commitment to ensure that such "edge" came from legitimate research and not Inside Information.  The predictable and foreseeable result, as charged herein, was systematic insider trading by the SAC ENTITY DEFENDANTS resulting in hundreds of millions of dollars of illegal profits and avoided losses at the expense of members of the investing public.

## The Operation Of The SAC Hedge Fund

8.    The SAC Hedge Fund functioned as a collection of dozens of individual portfolios, each headed by a portfolio manager responsible for his or her portfolio's profit-and-loss results, and each charged with sharing the best trading ideas with the SAC Owner directly.

9.    In particular, the SAC Owner allocated investment capital between and among up to approximately 100 internal portfolios, each of which was generally managed by a SAC PM who specialized in a particular investment sector, such as technology, health care, financial services, industrial, consumer, or energy.  Each portfolio manager, in turn, typically employed one or more research analysts to assist with the development of investment ideas for the SAC PM's portfolio.

10.   The SAC Hedge Fund portfolios were in many ways autonomous from each other.  Each SAC PM had substantial discretion to make investment decisions in his or her portfolio, even if a position was contrary to a position taken by other SAC PMs operating a portfolio in the same sector.  Each SAC PM was compensated principally based on the performance of his or her own portfolio, and without regard to the investment performance of other SAC PMs.  Likewise, SAC RAs were compensated largely at

5

the discretion of the SAC PM to whom the SAC RA reported and based on the profitability of that PM's portfolio.

11.    The largest portfolio in existence at the SAC Hedge Fund was, at all relevant times, a portfolio managed by the SAC Owner himself.  The SAC Owner had sole trading discretion over his portfolio and made these decisions principally based on trading recommendations from SAC PMs.  In particular, at all relevant times the SAC Owner required each SAC PM to share "high conviction" investment ideas — i.e., the investment recommendations in which the SAC PM had the greatest confidence — with the SAC Owner.  In fact, providing such ideas to the SAC Owner was an express part of a SAC PM's duties and was emphasized to SAC PMs in the hiring process and once working at SAC.

12.    In order to facilitate the collection of top trading ideas from the SAC PMs, the SAC ENTITY DEFENDANTS employed different systems at various times, including, for example, a template filled out on SAC's computer system and designated voicemail and e-mail boxes to collect trading ideas. In addition to these formal systems, the SAC Owner communicated with SAC PMs regularly through various means to ascertain their best trading ideas, including during semi-regular Sunday evening

calls and in-person conversations.  To assist in processing SAC
PM ideas, the SAC Owner at times employed sector-focused
"research traders" who, among other things, ensured that the
ideas of SAC PMs in the sector were brought to the SAC Owner's
attention and monitored the trading of the SAC PMs to ensure
that the trading was consistent with recommendations made to the
SAC Owner.

13.   At all relevant times, the SAC ENTITY DEFENDANTS
formally tracked trades made by the SAC Owner in the portfolio
he personally managed in order to "tag" or credit the SAC PM
responsible for the idea.  At all relevant times, the SAC ENTITY
DEFENDANTS paid SAC PMs an annual bonus — which could in some
cases exceed all other components of compensation — based on a
percentage of the net profits made by the SAC Owner on trades
"tagged" to a particular SAC PM.

## SAC PMs and SAC RAs Who Obtained Or Traded On Inside Information While Employed By The SAC ENTITY DEFENDANTS

14.   Numerous SAC PMs and SAC RAs, not all of whom
are identified herein, obtained or traded on Inside Information
while employed by one or more of the SAC ENTITY DEFENDANTS.
Each of the eight individual SAC PMs or SAC RAs identified by
name below have been charged with and/or convicted of trading on
Inside Information in connection with one or more of the SAC

ENTITY DEFENDANTS:

     a.   Wes Wang ("Wang") was a SAC RA specializing in the technology sector employed by SIGMA CAPITAL from approximately 2002 to 2005.  While serving as a SAC RA, Wang obtained Inside Information with respect to various technology companies, including but not limited to Taiwan Semiconductor Manufacturing Company Limited ("TSMC"), Cisco Systems, Inc. ("Cisco"), Broadcom Corporation ("Broadcom"), eBay, Inc. ("eBay"), Cypress Semiconductor Corporation ("Cypress"), Polycom, Inc. ("Polycom"), QLogic Corporation ("QLogic") and Cirrus Logic Inc. ("Cirrus").  Wang provided trading ideas based on Inside Information to the portfolio manager to whom he reported ("Sigma PM-1").  On or about July 13, 2012, Wang pled guilty in federal court to two counts of conspiracy to commit securities fraud, one of which involved insider trading in connection with Wang's employment at SIGMA CAPITAL from 2002 to 2005.  At his guilty plea, Wang admitted that, while at SIGMA CAPITAL, he had obtained Inside Information and provided it to Sigma PM-1 to be used for the purchase and sale of securities.

     b.   Richard Choo-Beng Lee ("CB Lee") was a SAC RA specializing in the technology sector employed by SAC CAPITAL LLC from approximately 1999 to 2003 and by SIGMA CAPITAL from

approximately 2003 to 2004.  While serving as a SAC RA, CB Lee

obtained Inside Information with respect to various technology

companies, including but not limited to Intel Corporation

("Intel"), Advance Micro Devices, Inc. ("AMD"), and Altera

Corporation ("Altera").  CB Lee provided trading ideas based on

Inside Information to the portfolio manager to whom he reported

and the SAC Owner.  On or about October 13, 2009, CB Lee pled

guilty in federal court to, among other things, conspiracy to

commit securities fraud and wire fraud relating to trading

recommendations based on Inside Information that CB Lee had

provided to Sigma PM-1 and others following CB Lee's departure

from SIGMA CAPITAL.  At his guilty plea, CB Lee admitted that he

obtained Inside Information and that he purchased and sold

securities based in part on such Inside Information.

      c.    Jon Horvath was a SAC RA specializing in the

technology sector employed by SIGMA CAPITAL from approximately

2006 through 2011.  Horvath served as a research analyst for

portfolio manager Michael Steinberg, who has been employed by

SIGMA CAPITAL from approximately 2003 to the present, and as a

portfolio manager for SAC CAPITAL LLC from approximately 1996 to

2003.  On or about September 28, 2012, Horvath pled guilty in

federal court to conspiracy and securities fraud for insider

trading Horvath committed while at SIGMA CAPITAL, including but
not limited to insider trading in relation to Dell Inc. ("Dell")
in August 2008 and NVIDIA Corporation ("NVIDIA") in May 2009.
Horvath admitted at his guilty plea that he obtained Inside
Information about Dell and NVIDIA and provided the Inside
Information to Steinberg, who executed trades in these stocks
based on that information.  On or about March 28, 2013, a grand
jury in the Southern District of New York returned an indictment
charging Steinberg with insider trading at SIGMA CAPITAL.

      d.    Noah Freeman was a SAC PM specializing in the
technology sector who was employed by SAC CAPITAL LLC in
approximately 2008 and by SAC CAPITAL LP from approximately 2009
to early 2010.  While serving as a portfolio manager, Noah
Freeman obtained and/or traded on Inside Information from
various technology companies, including but not limited to,
Research in Motion, Ltd. ("RIMM"), NVIDIA, Marvell Technology
Group, Ltd. ("Marvell"), Avnet, Inc. ("Avnet"), Fairchild
Semiconductor ("Fairchild"), Atheros Communications, Inc.
("Atheros"), Broadcom and Dell.  On or about February 7, 2011,
Noah Freeman pled guilty in federal court to, among other
things, conspiracy and securities fraud for insider trading he
committed while employed by SAC CAPITAL LLC and SAC CAPITAL LP.

At his guilty plea, Freeman admitted that he obtained Inside Information, and that he purchased and sold securities based in part on such Inside Information in connection with his employment at SAC CAPITAL LLC and SAC CAPITAL LP.

e.   Donald Longueuil was a SAC PM specializing in the technology sector who was employed by CR INTRINSIC from approximately 2008 through 2010.  While serving as a portfolio manager, Longueuil obtained and/or traded on Inside Information from various technology companies, including but not limited to, RIMM, NVIDIA, Marvell, Avnet, Fairchild, Atheros, Broadcom and Dell.  On or about April 28, 2011, Longueuil pled guilty in federal court to, among other things, conspiracy and securities fraud for insider trading he committed while employed by CR INTRINSIC.  At his guilty plea, Longueuil admitted that, while he was employed by CR INTRINSIC, he received Inside Information for the purpose of trading on that information at CR INTRINSIC.

f.   Mathew Martoma was a SAC PM specializing in the health care sector employed by CR INTRINSIC from approximately 2006 to 2010.  On or about December 21, 2012, a grand jury in the Southern District of New York returned an indictment charging Martoma with insider trading at CR INTRINSIC relating to shares of Elan Corporation, plc ("Elan") and Wyeth.

11

g.   Richard Lee was a SAC PM employed by SAC CAPITAL LP between approximately April 2009 and June 2011, and again between approximately September 2012 and March 2013, who focused on "special situations" across industry sectors such as mergers, acquisitions, private equity buy-outs and corporate restructurings.  While serving as a SAC PM, Richard Lee obtained Inside Information with respect to various securities, including but not limited to, Yahoo! Inc. ("Yahoo") and 3Com Corporation ("3COM").  On or about July 23, 2013, Richard Lee pled guilty in federal court to an information charging Lee with conspiracy and securities fraud in connection with his employment at SAC CAPITAL LP.  At his guilty plea, Richard Lee admitted that he obtained Inside Information and that he purchased and sold securities based in part on such Inside Information in connection with his employment at SAC CAPITAL LP.

### The Facilitation Of The Scheme By The SAC ENTITY DEFENDANTS

15.   The insider trading scheme committed by the SAC ENTITY DEFENDANTS through the conduct of their agents was facilitated through practices employed by the SAC ENTITY DEFENDANTS that encouraged SAC PMs and SAC RAs to pursue industry contact networks to obtain an information "edge" unavailable to other investors, without effective corresponding

controls to prevent that "edge" from consisting of Inside Information.  In particular, as described herein: (1) the SAC ENTITY DEFENDANTS routinely sought to hire SAC PMs and SAC RAs with networks of contacts likely to have access to Inside Information; (2) SAC PMs and SAC RAs were required to share their best investment ideas with the SAC Owner while indications that those ideas were based on Inside Information were often ignored; and (3) the SAC ENTITY DEFENDANTS failed to employ the necessary compliance measures to detect or prevent trading on Inside Information.

The Hiring of SAC PMs and SAC RAs With Access To Inside Information

16.   In furtherance of the scheme, the SAC ENTITY DEFENDANTS sought to hire PMs and RAs believed by the SAC Owner and others in SAC management to have an "edge" based in part on networks of contacts with employees of public companies in the sector in which the SAC PM or SAC RA specialized.  The focus on hiring employees with such networks was not balanced by any corresponding effort to ensure that prospective SAC PMs and SAC RAs did not use these contacts to obtain illegal Inside Information.

17.   The first stage of SAC's hiring process was handled by the SAC "business development" department, which

sought to build relationships with and recruit SAC PMs and SAC
RAs.  E-mails from the business development team to the SAC
Owner and others reflected an emphasis on hiring personnel with
company contacts in their respective sectors.  For example, a
brief write-up of a SAC PM candidate specializing in the
industrial sector forwarded to the SAC Owner on or about
November 16, 2008, described the candidate as "the guy who knows
the quarters cold, has a share house in the Hamptons with the
CFO of [a Fortune 100 industrial sector company], tight with
management."

      18.    After a SAC PM or SAC RA candidate was
preliminarily approved for hiring, the SAC ENTITY DEFENDANTS
subjected the candidate to a "due diligence" process that
involved interviewing the candidate's references, prior
employers and others, in part to identify the strength of the
candidate's industry contact networks.  For example, the due
diligence report for Horvath — who obtained Inside Information
from company insiders while employed at SIGMA CAPITAL —
identified Horvath's "contacts with companies" as a "key
strength" and noted that Horvath generated investment ideas by
"mining his industry contact network for datapoints." Likewise,
the due diligence report for Martoma - who is charged with

14

trading based on Inside Information from doctors with access to
confidential drug trial data while employed at CR INSTRINSIC –
referred to Martoma's health care "industry contacts beyond
management[]" including through two expert networking firms and
Martoma's personal "network of doctors in the field."  There was
no reference in the due diligence reports for Horvath or Martoma
(or, generally, for other candidates) to ethics, integrity,
compliance or whether the candidate had or was likely to use the
referenced contacts to obtain or to make trades based on Inside
Information.

          19.  In fact, on at least one occasion the SAC ENTITY
DEFENDANTS hired a candidate despite a recognized reputation for
insider trading.  In particular, in or around the summer of
2008, the SAC Owner received a warning from an employee of
another hedge fund ("Hedge Fund A") that Richard Lee, who
previously had worked at Hedge Fund A, and was known for being
part of Hedge Fund A's "insider trading group."  A SAC business
development employee subsequently informed Richard Lee that the
SAC Owner had decided to hire Richard Lee as a SAC PM anyway,
overruling objections from SAC's legal department.  Richard Lee
then proceeded to obtain and make trades based on Inside

Information shortly after starting his employment at SAC Capital in approximately April 2009.

The Failure By The SAC Owner And Others To Question SAC Trading Recommendations Bearing Indicia Of Being Based On Inside Information

20.   Furthering the scheme, the SAC Owner encouraged SAC PMs and SAC RAs, through financial incentives and otherwise, to share "high conviction" trading ideas — including ideas developed through industry contacts — while often ignoring indications that trading recommendations were based on Inside Information.

21.   In particular, on multiple occasions SAC PMs and SAC RAs communicated to the SAC Owner trading recommendations sourced to information from a contact "at" a public company or with similar language.  In these cases, the SAC Owner failed to inquire whether the contact was permitted to disclose the company information or to take other steps to ensure that the trade was not based on Inside Information.  For example:

a.   In an e-mail dated June 11, 2008, a SAC PM employed by CR INTRINSIC ("CR Intrinsic PM-1") wrote to the SAC Owner that "my guy at [company name]" had explained why certain anticipated acquisitions had not occurred.  In a second e-mail, dated May 3, 2009, CR-Intrinsic PM-1 wrote to the SAC Owner,

16

referring to the same company: "I am very comfortable that this qtr is going to be solid vs current consensus and guidance.  I am getting coffee on tues afternoon with the guy who runs north American generics business."  The SAC Owner replied: "Let's talk later."

       b.   On or about October 30, 2007, Horvath e-mailed a trading recommendation concerning Sun Microsystems, Inc. ("Sun") to an e-mail address used by the SAC Owner to receive investment ideas from SAC PMs and SAC RAs.  Horvath wrote: "My edge is contacts at the company and their distribution channel."  The SAC Owner did not ask Horvath whether his "contacts at the company" were permitted to share the information that had provided Horvath with his "edge."  Similarly, on or about August 26, 2008, Horvath wrote an e-mail to Steinberg, which was forwarded to the SAC Owner, stating that his recommendation to sell Dell stock in advance of a quarterly earnings announcement was based on a "2nd hand read from someone at the company" who had "been very good in the last two quarters."  The SAC Owner did not question Horvath about his contact but did begin selling off his approximately $12.5 million Dell position approximately 10 minutes after receiving the e-mail.

c.   On or about February 26, 2007, Martoma initiated a chat with the SAC Owner via instant message relating to a drug approval announcement by a major pharmaceutical company ("Pharma Company 1") that had taken the financial market by surprise. Martoma advised the SAC Owner that Martoma had a "better edge" with respect to upcoming news about a second drug in development by Pharma Company 1 because "the second product is partnered with a small biotech company, while first was internal to [Pharma Company 1] only."  The SAC Owner responded: "and I would think u have a line into small co," to which Martoma responded "yes."

d.   On or about April 11, 2008 and April 12, 2008, the SAC Owner exchanged several e-mails with two CR INTRINSIC health care analysts ("Analyst 1" and "Analyst 2") about information they had obtained through a paid consultation with a clinical investigator (the "Clinical Investigator") for a drug trial being conducted by Elan and Wyeth for an Alzheimer's disease drug (the "Drug Trial").  Analyst 2 e-mailed the SAC Owner that the Clinical Investigator had told Analyst 2 that he "had seen the data as of December" for the Drug Trial, and that "it was not stat significant."  In a second e-mail to the SAC Owner, Analyst 1 added that the Clinical Investigator had told

18

them that the data from an "interim look" was "'close' to significant" in some cases and that it "was possible but unlikely" that the "final data" would be statistically significant.  In a third e-mail, Analyst 1 responded to the SAC Owner's question about whether it was likely that the Clinical Investigator had seen this data by reiterating that the Clinical Investigator "said he saw the data before agreeing to be in the study" and that it would not be "unreasonable" for the Clinical Investigator to be among the "small # of ppl [who] have seen the [Drug Trial] data."  The SAC Owner did not question or express concern that Analyst 1 or Analyst 2 were paying a doctor involved in a drug trial for a consultation about non-public drug trial data seen by only a "small # of ppl."  Instead, the SAC Owner directed Martoma to follow-up with the Clinical Investigator, which Martoma did and reported back.

e.   Indeed, the SAC Owner expressed confidence in Martoma on the grounds that Martoma was "close" to sources of information about the Drug Trial while failing to express concern about the potential for Martoma to receive Inside Information from these sources.  For example, in an instant message exchange on or about April 6, 2008, the SAC Owner responded to Analyst 2's inquiry as to whether the SAC Owner had

"been able to get a better sense of why Martoma thinks" the Drug Trial data would be statistically significant as follows: "seems like Mat [Martoma] has a lot of good relationships in this arena."  In another instant message, on or about March 26, 2008, the SAC Owner responded to Analyst 1's question as to whether Martoma and a second person "know something or do they have a very strong feeling" as follows: "tough one[.] I think Mat [Martoma] is closest to it."  Analyst 1 and Analyst 2 complained in e-mails between themselves that Martoma was "telling ppl he has black edge" – a phrase meaning Inside Information – with respect to the outcome of the Drug Trial.  Analyst 1 and Analyst 2 expressed no concern in these e-mails about the legality of Martoma proposing to trade on the Inside Information, focusing instead on whether Martoma was being "intellectually honest" in telling people he had "black edge" when Analyst 1 and Analyst 2 believed it was not yet possible to know the Drug Trial results.

22.  Similarly, in connection with the hiring process, the SAC Owner failed to question candidates who at minimum implied that their "edge" was based on sources of Inside Information.  For example, on several occasions in June 2009, CB Lee spoke to the SAC Owner about the possibility of providing the SAC Owner with trading ideas on particular companies in

return for a payout on the SAC Owner's profits.  CB Lee told the SAC Owner that he had people in sales and in finance at NVIDIA who gave him information relating to quarterly earnings and a contact at TSMC who provided him with wafer data.  The SAC Owner did not express any concern about CB Lee's proposed sources of information during these conversations.

23.  Also furthering the scheme, the SAC Owner fostered a culture that focused on not discussing Inside Information too openly, rather than not seeking or trading on such information in the first place.  For example, on or about July 29, 2009, a recently hired SAC PM (the "New PM") sent an instant message to the SAC Owner and relayed that, due to some "recent research," the New PM planned to short Nokia when he started work 10 days later.  The New PM apologized for being "cryptic" but noted that the head of SAC compliance "was giving me Rules 101 yesterday – so I won't be saying much[.] [T]oo scary."  The SAC Owner did not react or respond in the instant message to the New PM's proposal to trade securities based on information that the New PM was "scar[ed]" to tell the SAC Owner for fear of violating compliance rules.

21

Ineffective Compliance Programs That Failed To Detect Or Thwart
Insider Trading

24.   Furthering the scheme, the SAC ENTITY DEFENDANTS
employed limited compliance measures designed to detect or
prevent insider trading by SAC PMs or SAC RAs.  As an initial
matter, the SAC ENTITY DEFENDANTS automatically purged all
instant messages after 36 hours and all e-mails not
affirmatively saved after 30 days until adopting a revised
document retention policy in September 2008.  In addition, prior
to approximately late 2009, SAC's compliance department rarely
reviewed electronic communications by SAC employees for
suspicious terms suggesting potential insider trading,
notwithstanding the fact that the head of SAC compliance had
recommended such searches to SAC management as early as 2005.

25.   Although the SAC compliance department,
beginning in approximately 2006, prohibited the use of expert
networks to make payments to public company employees for
industry information, SAC encouraged direct contact with public
company employees at various levels outside of these networks.
For example, in or around 2006, when Richard Lee initially
interviewed for a job at SAC and told a senior SAC executive
that his investment process involved, among other things,
consultations through an expert network, the SAC executive

22

responded in substance that most SAC PMs relied on their own personal networks of industry contacts. In fact, as reflected in examples noted elsewhere in this Indictment, SAC PMs and SAC RAs routinely consulted public company employees at various levels and recommended trading ideas to the SAC Owner expressly based on information obtained through contacts at these companies.

26. Moreover, notwithstanding that the SAC compliance department was apparently aware that expert networks presented a risk of insider trading, the SAC compliance department failed to effectively monitor SAC employees' use of expert networking firms. For example, the SAC compliance department failed to detect or prevent Martoma from using an expert network for approximately 42 consultations with a doctor involved in the Drug Trial, even though some of the expert networking firm's scheduling e-mails with Martoma – sent through the SAC e-mail system – expressly stated that (1) the doctor in question had confidential information about the Drug Trial; and (2) the purpose of the consultation was to ask the doctor about the experimental medicine being tested in the Drug Trial. The doctor in question in fact provided Martoma with Inside

Information about the Drug Trial during many of these consultations.

27.    Also furthering the scheme, on several occasions SAC management failed to refer trading recommendations that appeared to be based on Inside Information to SAC's compliance department for investigation.    For example, on or about October 30, 2007, Horvath's trading recommendation emailed to the SAC Owner concerning Sun stated "[m]y edge is contacts at the company and their distribution channel."    Steinberg, who was copied on the e-mail, forwarded it to the SIGMA CAPITAL Chief Operating Officer (the "COO") with the comment: "I suspect the line about contacts at the company may wake up some of our legal eagles."    The COO responded: "I think it might precipitate a general inquiry to confirm we are not in possession of non public information.    This seems like an investment idea, not a trade and my interpretation of his comment is just that he developed good relationships with mgmt. that enhance his comfort level."    The COO arrived at this benign (and unsubstantiated) interpretation without anyone interviewing Horvath about his e-mail.    In truth and in fact, Horvath's e-mail was based on confidential information about Sun earnings that Horvath had obtained from his contact at Sun.

24

28.   Also furthering the scheme, the limited number of internal investigations by the SAC compliance department of insider trading were generally weak, with a focus on "confirming" with a SAC PM or SAC RA in an interview that an e-mail implying access to Inside Information was an inartfully drafted e-mail.   In fact, despite numerous documented cases of insider trading at SAC – established by, among other things, guilty pleas of six former SAC PMs and RAs who each committed insider trading on numerous occasions and over a substantial period of time while employed at SAC – SAC's compliance department contemporaneously identified only a single instance of suspected insider trading by its employees in its history.

29.   SAC's resolution of the one case in which it identified suspected insider trading also reflected a lack of commitment to address the issue.   On this occasion, information reviewed by SAC's compliance department demonstrated that CR Intrinsic PM-1 and a second PM ("SAC PM-1") had received and then traded based on an advance tip from an outside health care analyst (the "Health Care Analyst") at a research firm doing business with the SAC ENTITY DEFENDANTS.   In particular, evidence reviewed by the SAC compliance department reflected that on the evening of July 27, 2009, the Health Care Analyst

25

communicated to CR Intrinsic PM-1 that his firm would publicly release a negative research report the next day about health care company Medicis, Inc. ("Medicis").  CR Intrinsic PM-1 then told this to the research analyst for SAC PM-1.  SAC PM-1's research analyst then admitted - as corroborated by e-mails and phone records - that he had, at SAC PM-1's direction, called the Health Care Analyst and learned that the negative research report would be publicly released in the "pm" of July 28, 2009. Both CR Intrinsic PM-1 and SAC PM-1 shorted the stock of Medicis before the report was released that evening.  Despite this, and despite the fact that it was the SAC Owner who had initially inquired about the trading, the consequences were limited.  The SAC ENTITY DEFENDANTS imposed monetary fines on the two offenders, but allowed them to keep their jobs, and failed to report the insider trading to any regulatory or law enforcement personnel.

### Examples Of Insider Trading By Agents Of Each Of The SAC ENTITY DEFENDANTS

30.  In connection with the scheme described above, SAC CAPITAL LP, SAC CAPITAL LLC, CR INTRINSIC and SIGMA CAPITAL, the defendants, through the conduct of their agents, sought to obtain and trade upon Inside Information on multiple occasions

between 1999 and at least 2010. This trading includes - but is not limited to - the conduct described below.

Insider Trading By Agents Of CR INTRINSIC

31. Agents of CR INTRINSIC, the defendant, obtained and traded upon Inside Information on multiple occasions, including but not limited to the examples described below:

a. Trading By Martoma And The SAC Owner In Elan And Wyeth. As of mid-July 2008, the SAC Hedge Fund's largest equity securities position consisted of over $700 million worth of Elan American Depository Receipts ("ADRs") and Wyeth common stock. The SAC Owner had accumulated the position in large part on the recommendation of Martoma. On or about July 17, 2008, Martoma obtained negative Inside Information from a medical doctor involved in the Drug Trial being conducted by Elan and Wyeth. On or about Saturday, July 19, 2008, Martoma met with the doctor in person in Michigan. On or about the morning of Sunday, July 20, 2008, Martoma spoke by telephone to the SAC Owner, who the next day began selling the entire $700 million position and shorting approximately $260 million worth of Elan and Wyeth stock prior to the public announcement of the Drug Trial results on or about July 29, 2008. The SAC Hedge Fund's profits and

avoided losses from this illegal insider trading amounted to approximately $276 million.

b.   Trading By Two SAC PMs And The SAC Owner Based On Information From CR Intrinsic RA-1.  On various occasions in 2008 and 2009, a technology sector research analyst for CR Intrinsic ("CR Intrinsic RA-1") obtained Inside Information from contacts at various technology companies, including earnings information from Dell (from the same source who provided Inside Information to Horvath) and acquisition-related information from Foundry Networks Inc. ("Foundry").  The two SAC PMs to whom CR Intrinsic RA-1 reported and the SAC Owner all placed profitable trades on one or more occasions shortly after recommendations made on the basis of Inside Information known to CR Intrinsic RA-1.

Insider Trading By Agents Of SIGMA CAPITAL

32.  Agents of SIGMA CAPITAL, the defendant, obtained and traded upon Inside Information on multiple occasions, including but not limited to the examples described below:

a.   Trading By Steinberg And The SAC Owner Based On Information From Horvath.  On or about August 18, 2008, Horvath learned from a contact in his network that an insider at Dell had disclosed that Dell's earnings would be below market

expectations and provided that information to Steinberg, who
immediately began shorting shares of Dell stock in Steinberg's
portfolio.  On or about August 26, 2008 at 12:37 p.m., Steinberg
e-mailed Horvath that he had been "talking to [the SAC Owner]
about Dell earlier today" and that the SAC Owner wanted Horvath
to "compare notes" with a different SAC PM who had taken a
contrary, bullish position on Dell.  At approximately 1:09 p.m.,
Horvath responded to Steinberg and the bullish SAC PM by e-mail:
"I have a 2nd hand read from someone at the company – this is
3rd quarter I have gotten this read from them and it has been
very good in the last two quarters.  . . .  Please keep to
yourselves as obviously not well known."  The e-mail further
reported that the gross margin for Dell would fall short by "50-
80 bps [basis points]."  The bullish SAC PM then forwarded the
Horvath e-mail to a "research trader" for the SAC Owner who
assisted the SAC Owner in trading technology stocks.  The
research trader, in turn, forwarded Horvath's e-mail directly to
the SAC Owner at approximately 1:29 p.m. and spoke by phone to
the SAC Owner at 1:37 p.m. for approximately one minute.  At
approximately 1:39 p.m., the SAC Owner began selling Dell shares
in his own portfolio, closing out his entire approximately $12.5
million position prior to the disappointing earnings

announcement, avoiding losses of approximately $1.7 million.   On

or about August 28, 2008, after Dell had publicly announced

earnings that, consistent with Horvath's Inside Information,

were below market expectations, the SAC Owner e-mailed

Steinberg's group, including Horvath: "Nice job on dell."

      b.    <u>Trading By Sigma PM-1 Based On Inside Information</u>

<u>From Wang.</u>  Between approximately 2002 and 2005, in connection

with his employment as a SAC RA, Wang recommended trades to

Sigma PM-1 based on Inside Information that Wang obtained from a

network of contacts at publicly-traded technology companies,

including but not limited to TSMC, Cisco, Broadcom, eBay,

Cypress, Polycom, QLogic and Cirrus.

      c.    <u>Trading Based On Inside Information From CB Lee.</u>

Between approximately 2008 and 2009, former SIGMA CAPITAL PM CB

Lee, who by then was operating his own hedge fund, recommended

trades based on Inside Information to Sigma PM-1.  The Inside

Information involved various technology sector stocks, including

Dell and NVIDIA.  For example, in a recorded call on or about

January 16, 2009, CB Lee told Sigma PM-1, "between you and me,"

that "a friend of my cousin" who "works for Dell finance," is

"telling me to avoid the stock for Q2, because Q2 is gonna be

horrible."  In a follow-up recorded call on or about January 23,

2009, CB Lee reiterated to Sigma PM-1 that "I do have a contact at Dell, he's in finance" and that the contact was reporting that the "April quarter could see a problem with gross margins" because sales to businesses were "very weak and that's where most of the profitability is."

<u>Insider Trading By Agents Of SAC CAPITAL LP</u>

33.   Agents of SAC CAPITAL LP, the defendant, obtained and traded upon Inside Information on multiple occasions, including but not limited to the examples described below:

a.   <u>Trading By Richard Lee.</u>  On various occasions between approximately April 2009 through approximately 2010, Richard Lee – who had been hired by SAC CAPITAL LP despite a warning to the SAC Owner that he had been part of an "insider trading group" at a prior employer – traded on Inside Information in the $1.25 billion "special situations" SAC portfolio Richard Lee jointly managed with a second SAC PM.  For example, Richard Lee obtained, from a contact at a private equity firm with a stake in Yahoo, both early access to a Yahoo earnings report and information relating to a contemplated partnership with Microsoft, the latter of which ultimately took place in or around July 2009.  Richard Lee – as well as other SAC PMs – also spoke to a technology analyst (the "Tech

Analyst") from a research firm doing business with the SAC Hedge
Funds about the potential Yahoo-Microsoft partnership.  In a
recorded call with Richard Lee on or about July 10, 2009, the
Tech Analyst told Richard Lee that his "buddy," a "senior guy at
Microsoft" who had been "very, very accurate in the past," told
the Tech Analyst that a "senior team from Yahoo" had arrived at
Microsoft to meet "the two senior-most people in [the] Microsoft
internet business" to restart deal talks.

Insider Trading By Agents Of Multiple SAC ENTITY DEFENDANTS,
Including SAC CAPITAL LLC and SAC CAPITAL LP

        34.   In some cases, such as the examples described
herein, instances of insider trading involved agents of multiple
SAC ENTITY DEFENDANTS either because different employees
involved in the trading worked for different SAC management
companies or because the employees switched between management
companies during the course of their employment.  Examples of
such trading include but are not limited to the following:

        a.    Trading At SAC CAPITAL LLC And SIGMA CAPITAL
Based On Inside Information From CB Lee.  In connection with his
employment as a SAC RA at SAC CAPITAL LLC and then SIGMA
CAPITAL, CB Lee sought and obtained Inside Information through
direct and indirect contacts at various technology companies
between approximately 1999 and 2004, including but not limited

to Intel, AMD, and Altera.  CB Lee then recommended trades based on this Inside Information to the portfolio manager to whom he reported and in some instances to the SAC Owner directly.  In these trading recommendations, CB Lee typically described the source of the information as being from "my guy," "my contact," or "my check" "at" the company in question.

      b.   <u>Trading At SAC CAPITAL LLC, SAC CAPITAL LP And CR INTRINSIC Based On Inside Information From Freeman And Longueuil.</u>  In connection with their employment, Freeman (employed first by SAC CAPITAL LLC and then SAC CAPITAL LP) and Longueuil (employed by CR INTRINSIC) obtained and traded on Inside Information between approximately 2008 and 2010 in a variety of technology companies, including but not limited to RIMM, NVIDIA, Marvell, Avnet, Fairchild, Atheros, Broadcom and Dell.

### Statutory Allegations

      35.  At various times from in or about 1999, through at least in or about 2010, in the Southern District of New York and elsewhere, SAC CAPITAL LP, SAC CAPITAL LLC, CR INTRINSIC, and SIGMA CAPITAL, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false

and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire, radio and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SAC ENTITY DEFENDANT employees and agents obtained by telephone, e-mail and other electronic forms of interstate communication, while located in SAC ENTITY DEFENDANT offices in Manhattan, New York and elsewhere, Inside Information concerning various public company stocks, some of which were publicly-traded on a stock exchange in Manhattan, New York, for the purpose of executing securities transactions based in whole or in part on that Inside Information.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO

(Securities Fraud: SAC CAPITAL LP)

The Grand Jury further charges:

36. The allegations contained in paragraphs 1 through 34 are repeated and realleged as though fully set forth herein.

37. From in or about 2009, up through and including at least in or about 2010, in the Southern District of New York and elsewhere, SAC CAPITAL LP, the defendant, willfully and

34

knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, SAC CAPITAL LP, through its employees and agents, engaged in a scheme to obtain and trade upon Inside Information.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 & 240.10b5-2; and Title 18, United States Code, Section 2.)

## COUNT THREE

(Securities Fraud: SAC CAPITAL LLC)

The Grand Jury further charges:

38.   The allegations contained in paragraphs 1 through 34 are repeated and realleged as though fully set forth herein.

35

39.   From in or about 1999, up through and including 2008, in the Southern District of New York and elsewhere, SAC CAPITAL LLC, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, SAC CAPITAL LLC, through its employees and agents, engaged in a scheme to obtain and trade upon Inside Information.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 & 240.10b5-2; and Title 18, United States Code, Section 2.)

**COUNT FOUR**

(Securities Fraud: CR INTRINSIC)

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1 through 34 are repeated and realleged as though fully set forth herein.

41.   From in or about 2006 up through and including at least in or about 2009, in the Southern District of New York and elsewhere, CR INTRINSIC, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, CR INTRINSIC, through its employees and agents, engaged in a scheme to obtain and trade

37

upon Inside Information.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 & 240.10b5-2; and Title 18, United States Code, Section 2.)

## COUNT FIVE

(Securities Fraud: SIGMA CAPITAL)

The Grand Jury further charges:

42.   The allegations contained in paragraphs 1 through 34 are repeated and realleged as though fully set forth herein.

43.   From in or about 2002, up through and including at least in or about 2009, in the Southern District of New York and elsewhere, SIGMA CAPITAL, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices

38

and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, SIGMA CAPITAL, through its employees and agents, engaged in a scheme to obtain and trade upon Inside Information.

   (Title 15, United States Code, Sections 78j(b) & 78ff;
   Title 17, Code of Federal Regulations, Section 240.10b-5 &
   240.10b5-2; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

   44.   As a result of committing the offenses alleged in Counts One through Five of this Indictment, the SAC ENTITY DEFENDANTS shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of those offenses.

## Substitute Assets Provision

   45.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

          a.   cannot be located upon the exercise of due diligence;

          b.   has been transferred or sold to, or deposited with, a third party;

39

       c.    has been placed beyond the jurisdiction of the court;

       d.    has been substantially diminished in value; or

       e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

    (Title 18, United States Code, Section 981; Title 21, United States, Section 853(p); Title 28, United States Code, Section 2461.)

Foreperson


**PREET BHARARA**
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

S.A.C. CAPITAL ADVISORS, L.P.,
S.A.C. CAPITAL ADVISORS, LLC,
CR INTRINSIC INVESTORS, LLC, and
SIGMA CAPITAL MANAGEMENT, LLC,

Defendants.

## INDICTMENT

**13 Cr.**

(18 U.S.C. §§ 2, 1343; Title 15, United
States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations,
Section 240.10b-5)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

7/23/13 - Filed Sealed Indictment
Judge Gorenstein
USMJ